NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-1792
_____

LI RONG ZHANG,
                    Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                    Respondent
_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge:  Honorable Rosalind K. Malloy
(No. A095-716-420)


_____

Submitted Under Third Circuit LAR 34.1(a)
August 10, 2012
_____

Before:  McKEE, Chief Judge, AMBRO, and ALDISERT, Circuit Judges

(Opinion filed: August 29, 2012)


_____

OPINION OF THE COURT
_____

AMBRO, Circuit Judge

Li Rong Zhang petitions for review of an order of the Board of Immigration Appeals affirming an Immigration Judge's order removing her to the People's Republic of China. For the reasons noted below, her petition for review is denied.[1]

**I.**

Because we write for the parties, we recite only briefly the facts of the case. Zhang is a single woman who was born on November 15, 1986 in Fujien Province, China. She entered the United States without proper entry documentation on December 8, 2005, at or near Los Angeles, California. Zhang was placed into removal proceedings by the service of a notice to appear, dated December 15, 2005, charging her as removable. Nine months later, Zhang filed for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Conceding that she is removable as charged, Zhang contended that she is entitled to relief from removal because she suffered past persecution when the head of her village, Chung Li, attempted to coerce her to marry his son, Guang Li. Specifically, Zhang testified that Li threatened to put her in jail if she did not marry his son. However, Zhang admitted that she was not arrested, held or tortured in China, and that she was able to escape from her village. Zhang also claimed that her parents were persecuted and fined for violating China's one-child policy, and that, as a result, she was forced to live with her grandparents. Within days after Li first attempted to coerce her to marry his son, Zhang went to live with her

---

[1] We thank *amicus curiae* counsel, Ayodele Gansallo of the Transnational Legal Clinic at the University of Pennsylvania Law School, for superb advocacy in this case.

aunt, with whom she stayed undetected for approximately 20 days before leaving China for Hong Kong, then Europe, and ultimately the United States.

The IJ made an adverse credibility finding against Zhang, noting, among other things, that "Chinese law has forbidden coerced marriage since 1950," and held that she had failed to establish that she suffered past persecution or that she would suffer future persecution. The IJ explained, in pertinent part, as follows:

> [B]ased on the testimony of the respondent[,] [e]ven if one were to find her testimony credible, the Court would find that she has not suffered past persecution. She was not forced into a marriage. She was not detained. [A] [m]arriage proposal, even by someone you detest, does not rise to the level of persecution. Respondent's family was not involved in this threat. . . . This was strictly, if you were to believe the respondent, the village head making proposals to her on behalf of his son. And even though he was a powerful individual, according to the respondent, the Court finds the proposals do not rise to the level of persecution. Respondent's testimony regarding being taken away from her home and being threatened with detention is unsupported by any credible evidence and again, the respondent was able to escape and live with a relative undetected.
>
> With respect to future persecution, the respondent has been away from China for more than two years. It is inconceivable that the village head is still looking for her to marry his son. The respondent certainly could not have been the only single woman in the village. There is no evidence that the village head remains interested in having the respondent as a daughter-in-law. Th[e] statement that she would be forced to marry the son of the village head, were she to return to China, is purely speculative.

The IJ denied her applications on April 14, 2008.

On March 9, 2009, the BIA dismissed Zhang's appeal, stating that "[f]or all the reasons noted by the [IJ], we agree that [Zhang] failed to carry her burden of establishing

3

that she has suffered past persecution or has a well-founded fear of future persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion." Zhang's petition for review is now before us.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a). In this case, because the BIA issued its own opinion on the merits, we review its decision rather than that of the IJ. *Li v. Att'y Gen.*, 400 F.3d 157, 162 (3d Cir. 2005). However, to the extent that the BIA deferred to or adopted the IJ's reasoning, we will look to and consider the decision of the IJ on those points. *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006).

We review factual findings under the substantial evidence standard, *Briseno-Flores v. Att'y Gen.*, 492 F.3d 226, 228 (3d Cir. 2007), upholding them "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Legal conclusions, including the application of law to fact, are reviewed *de novo*. *Francois v. Gonzales*, 448 F.3d 645, 648 (3d Cir. 2006). "So long as the BIA's decision is supported by 'reasonable, substantial, and probative evidence on the record considered as a whole,' we will not disturb the BIA's disposition of the case." *Chavarria*, 446 F.3d at 515 (quoting *INS v. Elias-Zacaris*, 502 U.S. 478, 481 (1992)).

## III.

Substantial evidence supports the BIA's decision. While Zhang contends that she was persecuted when the village chief attempted to coerce her into marrying his son, and

4

that she suffered this persecution on account of her membership in a particular social group,[2] the alleged wrongs here do not rise to the level of persecution.

Persecution is defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993). Persecution "does not encompass all treatment our society regards as unfair, unjust or even unlawful or unconstitutional." *Id.*

Here, Zhang was not forced into marriage. She received two allegedly coercive marriage proposals and was threatened with detention. But she was not forced to marry Li's son against her will, she was not detained, and she was able to escape the perceived threat and reside with her aunt in another part of China without being detected. As for

---

[2] The IJ defined the possible particular social group as "single women" or "single women whose parents oppose [China's] family planning policy." Oral Decision and Order of the IJ at 15. On appeal to the BIA, the particular social group is defined as "people who are forced into marriage by someone other than [their] parents." Decision of the BIA at 2. Before us, the Government and *amicus* defined the particular social group as "women who are forced into marriage by someone other than their parents." Gov't Supplemental Letter Br. at 6-7; *Amicus* Supplemental Letter Br. at 1. *Amicus* also raises two other potential definitions: "women in China" and "women in China who are opposed to the practice of forced marriage." *Amicus* Supplemental Letter Br. at 2 n. 4.

We do not pass judgment on whether any of these definitions could constitute a particular social group, nor on whether Zhang would be a member of any such particular social group. We do note, however, that two Courts of Appeals have indicated that those forced into marriage possibly could constitute a particular social group. *See Gao v. Gonzales*, 440 F.3d 62, 69 (2d Cir. 2006) (holding that the relevant social group was "women who have been sold into marriage (whether or not that marriage has yet taken place) and who live in a part of China where forced marriages are considered valid and enforceable"), *vacated and remanded on other grounds by Keisler v. Hong Yin Gao*, 552 U.S. 801 (2007); *Bi Xia Qu v. Holder*, 618 F.3d 602, 607 (6th Cir. 2010) ("[I]t appears that [the petitioner] has shown that she was a member of a particular social group of women in China who have been subjected to forced marriage and involuntary servitude.").

Zhang's claimed fear of future persecution, we agree with the IJ that, without substantial further evidence, "[i]t is inconceivable that the village head is still looking for her to marry his son" several years later. Without evidence showing a reasonable likelihood that Zhang experienced past persecution or has a well-founded fear of future persecution, *see* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), we agree with the IJ and BIA that she has failed to demonstrate that she qualifies for asylum.

Zhang's failure to meet the test for asylum necessarily precludes her from meeting the more stringent standard for withholding of removal. *See Yu v. Att'y Gen.*, 513 F.3d 346, 349 (3d Cir. 2008). We also agree that Zhang failed to establish eligibility for protection under the CAT. *See* 8 C.F.R. § 208.16(c).

In sum, the evidence in this case does not compel us to overturn the agency's decision to deny Zhang's claims. We therefore deny the petition for review.[3]

---

[3] Contrary to our dissenting colleague's characterization, the Government does not "agree that a remand is needed to correct [the BIA's] errors" with respect to the particular social group issue. Rather, it seeks denial of the petition for review, contending, among other things, that "the social group issue need not be reached because the agency's determination that Zhang failed to establish a well-founded fear of future arranged marriage disposes of the asylum and withholding of removal claims and moots the social group issue." Gov't Supplemental Letter Br. at 1. As explained above, we agree with the Government that the particular social group issue need not be reached because of Zhang's inability to establish a reasonable likelihood of past or future persecution.

ALDISERT, Circuit Judge, dissenting.

To qualify for the discretionary relief of asylum, an individual must be a "refugee," defined as any person who is "unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of" her country of nationality "because of persecution or a well-founded fear of persecution *on account of race, religion, nationality, membership in a particular social group, or political opinion*." 8 U.S.C. § 1101(a)(42) (emphasis added). Here, we are confronted with the rare circumstance in which both parties before our Court agree that the Board of Immigration Appeals ("BIA" or "Board") erred by concluding that Zhang was not a member of a certain social group—"persons forced to marry by someone other than their parents"—without providing any accompanying analysis about whether such a group exists nor why Zhang could not show that she belongs to it. Both parties further agree that a remand is needed to correct its errors. I join the parties in agreeing that the Board's failure to explain Zhang's non-membership in that group was reversible error.

Although we requested supplemental briefing on the question of whether women who are forced to marry by someone other than their parents can compromise a protected social group under the INA, the Board's failure to reach this issue and find facts necessary for its resolution deprives us of jurisdiction to now rule on it. Accordingly, I would remand for a more thorough evaluation of what group(s) Zhang's case might implicate and whether the facts here demonstrate her membership in any of them.

I.

Before addressing the merits of this issue, it is important to briefly explain the legal background onto which this case is cast. Integral to any asylum or withholding of removal claim under § 208 is an alien's claim that her persecution was "on account of"

1

one of the grounds specified in that statute. Zhang contends that she is entitled to relief because of her persecution on account of her membership in a "particular social group." This "particular social group" concept has proven ponderous in its application. In <u>Fatin v. INS</u>, 12 F.3d 1233 (3d Cir. 1993), we wrote: "Both courts and commentators have struggled to define 'particular social group.' Read in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.' Thus, the statutory language standing alone is not very instructive." <u>Id.</u> at 1238 (footnotes omitted).

Against that nebulous backdrop, the Attorney General has provided some guidance. In the seminal case on this topic, <u>In re Acosta</u>, 19 I. & N. Dec. 211, 233 (BIA 1985), <u>overruled on other grounds by</u> <u>In re Mogharrabi</u>, 19 I. & N. Dec. 201 (BIA 1985), the Board interpreted "particular social group" to mean a collection of individuals united by (1) a shared immutable characteristic, which may be (a) innate (such as gender or race), or (b) acquired through past experience (such as former military service or land ownership); or (2) a shared mutable characteristic of the sort that a person "should not be required to change because it is fundamental to their individual identities or consciences." <u>Id.</u> at 233-234. Importantly, "the particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis." <u>Id.</u> at 233.

In addition to the <u>Acosta</u> requirements—which we have adopted as binding in this Circuit, <u>see</u> <u>Fatin</u>, F.3d at 1239-1240—we have recognized two other hurdles a petitioner must clear when defining a "particular social group." First, because the complained-of persecution must occur "on account of" membership in a social group, and not vice-versa, a petitioner cannot circularly define a social group in terms of the persecution suffered. <u>See</u> <u>Lukwago v. Ashcroft</u>, 329 F.3d 157, 172 (3d Cir. 2003) (holding that

2

"children from Northern Uganda who are abducted and enslaved by the LRA and oppose their involuntary servitude to the LRA" could not constitute a "particular social group" for a past persecution claim because the complained-of persecution created the group). Instead, "[a] 'particular social group' must exist independently of the persecution," and "must have existed before the persecution began." Id. For future persecution claims, though, past persecution may define a social group if the feared future persecution is different from the past persecution, see id. at 172-173 (holding that "former child soldiers" could constitute a "particular social group" for purposes of claiming future persecution because the past persecution—kidnapping and forced military service— differed from the feared persecution—execution for desertion).

Second, a proposed social group definition must not be so "vague and all encompassing" that it obfuscates a meaningful analysis of the impetus for the complained-of persecution. Escobar v. Gonzales, 417 F.3d 363, 368 (3d Cir. 2006) (rejecting a proposed social group of street children alleged to share the common characteristics of "poverty, homelessness and youth" for being so vague as to frustrate an evaluation of whether persecution was "on account" of those characteristics).

## II.

Turning to the case at hand, the Immigration Judge ("IJ") and BIA both found that Zhang did not belong to a protected social group. After Zhang and her counsel struggled to define the protected social group to which Zhang belonged, they ultimately proposed two groups—"single women in China," or "single women in China whose parents oppose family planning laws." The IJ found these groups overly broad.

On appeal, the Board affirmed the IJ's conclusion. Rather than discuss the social groups considered by the IJ, the Board cursorily dismissed Zhang's claim with reference

3

to a third, as-yet-undiscussed group: "people who are forced into marriage by someone other than their parents." App. 00003. The Board's analysis on this topic, in full, was as follows:

> We further agree with the Immigration Judge that the respondent has not met her burden of proving membership in a particular social group (people who are forced into marriage by someone other than their parents) that is subject to persecution in China. [In re] H-, 21 I. & N. Dec. 337 (BIA 1996) (holding claims based upon membership in a particular social group must show that persecution will be directed toward a member of a group of persons that share a common, immutable characteristic that they cannot change, or should not be required to change because it is fundamental to their individual identities or consciences); [In re] C-A-, 23 I. & N. Dec. 951 (BIA 2006) (holding a particular social group may also be distinguished by its "social visibility"); see also [In re] A-M-E- & J-G-U-, 24 I. & N. Dec. 69, 74-76 (BIA 2007).

App. 00003.

The parties agree that the Board's bare-bones conclusion was insufficient. See, e.g., Supp. Ltr. Brief for United States 7 ("In discussing whether the putative group of 'people who are forced into marriage by someone other than parents' is a 'particular social group' within the meaning of the INA, the Board's decision in Zhang's case is ambiguous or not entirely clear."). Indeed, even a brief evaluation of the Board's opinion reveals it to be sorely wanting: the Board did not explain *whether* such a group exists, much less *why* Zhang is not a member of it.[1]

---

[1] Indeed, Amicus contends that the formulations considered by the Board doomed Zhang from the start, because the group of "women who have been forced into marriage" is defined *precisely* in terms of the persecution. Amicus suggests that a more appropriate formulation for this case would be "women in China who are opposed to the practice of forced marriage." Amicus contends that this group satisfies Acosta's mutable-fundamental test, because a woman's opposition to marrying a particular person is a belief so fundamental to her identity that she ought not be required to change it. By defining itself independently from the persecution, moreover, this construction avoids the self-referential problem explained above. Most importantly, it applies neatly to Zhang,

4

Its case citations provide no additional guidance. Of the three cases the Board cited, the precepts espoused in the latter two, In re C-A- and In re A-M-E- & J-G-U-, have since been specifically discredited by our Court. See Valdiviezo-Galdamez v. Att'y Gen., 663 F.3d 582, 603-609 (3d Cir. 2011). In the first case, In re H-, the Board concluded that members of a specific sub-clan in Somalia constituted a "particular social group" under Acosta's immutable-innate characteristic rubric.

Viewing the Board's opinion here charitably, one might conjecture that the Board included this citation to In re H- to explain that "people who are forced into marriage by someone other than parents" are not united by an immutable-innate characteristic, in contrast to the hereditary-clan-member petitioner in In re H-. Even if one interprets the Board's citation to In re H- to imply the conclusion that Zhang's putative group lacks an immutable-innate characteristic, though, the Board's opinion still remains unsalvageable. Under Acosta, if a proposed group is not united by (1.a) a common immutable-innate characteristic, the Board must still evaluate whether the group might be united by (1.b) a non-innate immutable characteristic formed by a past experience, or by (2) a mutable but fundamental trait. See Acosta, 19 I. & N. Dec. at 233. As the government freely admits here, "[t]here is no indication in the language of the Board's decision that it decided either of these alternative means of satisfying the Acosta standard for a social group." Supp. Ltr. Brief for United States 8.

I cannot discern from the Board's opinion whether it evaluated Zhang's putative social group—"people who are forced into marriage by someone other than parents"—

---

whose complained-of persecution (threats of selective enforcement of the law resulting in imprisonment ) is "on account of" her membership in the group (her opposition to marrying the chief's son).

5

under the other prongs of the <u>Acosta</u> standard. Resolving that question would require finding additional facts, applying legal standards to those facts, and concluding in the first instance a number of legal questions of first impression, including: (1) whether the experience of forced marriage is "immutable"; (2) whether the ability to choose one's spouse is so fundamental to human conscience and dignity that one should not be deprived of that experience by a forced marriage; and (3) whether Zhang may even maintain a past persecution claim on this ground as someone who has never actually been "forced into marriage" at all—indeed, she fled before she wed. All parties thus agree that a remand is in order. <u>See</u> <u>Gonzales v. Thomas</u>, 547 U.S. 183, 186 (2006) (per curiam) (holding that a remand to an administrative agency is needed where sufficient facts have not been found).

III.

For the foregoing reasons, I respectfully disagree with the Majority and would remand to the BIA for a more thorough evaluation of what group(s) Zhang's case might implicate and whether the facts here demonstrate her membership in any of them. Although I reserve judgment on whether Zhang actually was persecuted or has a well-founded fear of future persecution, I would reverse the BIA's cursory conclusion to the contrary and remand for a more thorough explanation, especially in light of the Board's re-determination of Zhang's social group membership, which may impact whether threats of imprisonment constitute persecution.